# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**TRISTAR LODGING, INC.,**

                **Plaintiff,**

**-vs-**                                      **Case No.  6:05-cv-98-Orl-DAB**

**ARCH SPECIALITY INSURANCE
COMPANY,**

                **Defendant.**
_____

# ORDER

      This cause came on for consideration without oral argument on the following motions filed

herein:

| MOTION: | MOTION FOR ATTORNEY'S FEES AND COSTS (Doc. No. 70) |
|---|---|
| FILED: | January 10, 2006 |
| **THEREON** it is **ORDERED** that the motion is **DENIED**. | |
| MOTION: | MOTION FOR ENTRY OF JUDGMENT AND TO CONFIRM APPRAISAL AWARD (Doc. No. 84) |
| FILED: | January 31, 2006 |
| **THEREON** it is **ORDERED** that the motion is **DENIED**. | |
| MOTION: | MOTION FOR SUMMARY JUDGMENT (Doc. No. 94) |
| FILED: | February 22, 2006 |
| **THEREON** it is **ORDERED** that the motion is **DENIED**. | |

### PROCEDURAL HISTORY AND BACKGROUND

"The first rule of hurricane coverage is that every broadcast must begin with palm trees bending in the wind."  Carl Hiaasen.

This is a lawsuit about a different type of hurricane coverage – insurance coverage, following the damaging storms of 2004.  According to the voluminous record,[1] Plaintiff owns a Hampton Inn which is insured by Defendant, Arch Specialty Insurance Company.  The property was damaged on August 13, 2004, by Hurricane Charley.  On September 5, 2004, Hurricane Frances roared in, and more damages were incurred.  The Policy provided for several different types of coverage, including building structural loss, business property loss and business interruption loss, and Plaintiff wrestled with the daunting task of assessing its significant damages in order to make and support appropriate claims to the insurer.  Due to the extent and nature of the damage, the situation was fairly fluid, with Plaintiff making decisions to repair, replace or salvage, as it struggled to return the property to operational status.  For the insurer's part, Plaintiff's understandable difficulties in clearly defining its losses led to understandable difficulties adjusting the losses.  Plaintiff made several claims of loss to its insurer, some of which overlap in time.  A chronology of these various claims is essential to analyze this suit for breach of contract.

**After the Storms, but before any Formal Proofs of Loss were filed**

It appears that the insurer (or the insurer's adjuster, Jack Goldin), and Plaintiff (or Plaintiff's representative, Public Adjuster Frank Fortson), had been in early communication following the hurricanes (Doc. No. 71-2).  Before any proof of loss was filed, Plaintiff had discussions with the

---

[1]As set forth herein, the parties were given numerous opportunities to create a record, including the opportunity to create an evidentiary record through trial.  The parties, however, have chosen to forego this opportunity and proceed via dispositive motion.  *See* Doc. Nos. 77, 78.  The Court thus makes its findings of fact from the record as provided by the parties.

insurer, and the insurer sent experts to inspect the property (Doc. No. 71-2).  On September 13, 2004, the insurer's architect emailed Plaintiff and requested various documents pertaining to re-roofing that had been done previously (Doc. No. 71-3).  On September 27, 2004, Plaintiff received an advance in the amount of $200,000 (Doc. No. 70).  On September 29, 2004, the insurer's contractor estimated the building damages at over a million dollars (Doc. No. 71-2 at 6).

**First Proof of Loss - building damage claim**

According to the Complaint, Plaintiff submitted a sworn Proof of Loss in the amount of $1,055,311.75 on October 4, 2004 (Doc. No. 1).  This claim was for the "carrier's undisputed building estimate" (Doc. No. 71-2, at 4-5).  As Plaintiff had received a $200,000 advance on September 27, 2004, an additional payment in the amount of $855,311.75 was made on November 3, 2004 (Doc. No. 70).  Thus, the first sworn proof of loss was tendered on October 4, 2004 and paid in full by November 3, 2004.

**Second Proof of Loss - building damage claim**

Although not alleged in the Complaint, on October 20, 2004, Plaintiff, through its Public Adjuster, sent a second sworn proof of loss relating to the building damage, claiming a loss in the amount of $2,695,414.93 (Doc. No. 71-6 at 2-3).[2]  On November 17, 2004, the insurer sent a letter to Plaintiff's representative, acknowledging receipt of the second proof of loss, and noting that the "building value and loss is still being reviewed and is subject to adjustment" but due to the volume of information involved, more time was needed "to review the claim to give a proper decision on payment." (Doc. No. 75-7).  The insurer requested a meeting at the Property with Plaintiff's contractor

---

[2]Plaintiff disagreed with the carrier's contractor estimate, and claimed that the actual loss was much greater than the amount already paid.

to "go over the scope and cost" and pledged to stay in weekly contact until the meeting was arranged. *Id.*

On December 6, 2004, Plaintiff filed suit against Arch Insurance Company in state court, for breach of the insurance contract.

On January 18, 2005, Arch Insurance Company removed the action to federal court, on the basis of diversity jurisdiction (Doc. No. 1). That same day, Arch Insurance Company moved to dismiss the complaint, asserting that Arch Insurance Company was not a party to the insurance contract; rather, Arch Speciality Insurance Company, a separate but affiliated company, was the correct party (Doc. No. 3).

On January 25, 2005, the parties met with their adjusters at the property (Doc. No. 71 at 8). On January 31, 2005, Arch Speciality formally invoked the right set forth in the Policy to an appraisal (as to the building loss) (Doc. No. 14-2).

On February 11, 2005, the District Court granted the motion to dismiss, dismissed the Complaint, and allowed Plaintiff 10 days to file an amended complaint against Arch Speciality Insurance Company (Doc. No. 16). An Amended Complaint was filed against the correct defendant (herein "Arch") on February 18, 2005 (Doc. No. 17). On March 9, 2005, Arch filed a motion to dismiss the Amended Complaint, asserting that documentation requests and the appraisal demand were outstanding, and compliance with the documentation and appraisal provisions of the Policy were conditions precedent to suit (Doc. No. 20). Plaintiff opposed the motion, contending that Arch waived its right to invoke appraisal and noting that appraisal was addressed only to the property loss and not other losses. On May 3, 2005, the District Court found that the appraisal process was properly invoked by Arch and granted the motion to dismiss, in part; staying the action for a period of 90 days

-4-

to allow the appraisal process to take its course (Doc. No. 27).  In its Order, the District Court noted: "Tristar does not contest that the appraisal provision marks a precondition to suit under the Policy." *Id.* at 2.

The appraisal process itself was fraught with conflict, and the wrangling is reflected in motions for protective orders, and various related  hearings and proceedings.  *See* Doc. Nos. 29-50.  On October 11, 2005, however, the Parties' Appraisers and Umpire came to a final agreement and executed a Final Appraisal Award regarding the building damage claim (Doc. No. 51 and 52).[3]  The Appraisal Award was paid by the insurer on October 27, 2005 (Doc. No. 71-2 at 10).

### Proof of Loss - Business Property

On October 20, 2004, the Public Adjuster submitted a sworn Proof of Loss relating to a business personal property claim in the amount of $594,283.74 (Doc. No. 71-2 at 5).[4]  On November 17, 2004, the insurer sent Plaintiff a letter (described above), acknowledging receipt of the "contents" claim, and noting that the insurer was "continuing to review" the contents inventory submitted, but due to the volume of information, "this will take several days" and required adequate time to review the claim to give a proper decision (Doc. No. 75-7). The insurer requested a meeting on site.  *Id.*  It was noted that Plaintiff had contracted with a salvor to determine salvage value of the contents and to handle any resulting sale, and "this was acceptable" to Arch.  *Id.*

As detailed above, Plaintiff filed suit in state court on December 6, 2004.

---

[3]Interestingly, although both sides claim to attach the Appraisal Award to their filings, the attachment is merely a bill for services.

[4]Illustrative of Plaintiff's difficulties in articulating and supporting its claims to the insurer and to this Court, Plaintiff's Public Adjuster avers that  he submitted a sworn proof of loss regarding business property (contents) (Doc. No. 71-2 at 5 and Doc. No. 74-2 at 7).  Plaintiff's counsel, on the other hand, states that Arch tendered payments for business personal property "notwithstanding that no SSPL [Sworn Statement in Proof of Loss] had been submitted by Hampton Inn for either Business Income or Business Personal Property." (Doc. No. 70-1 at 4).

On December 28, 2004, a check was issued in the amount of $300,000 for an advance of business personal property, based on the October 20, 2004 proofs of loss. (Doc. No. 71-2 at 8).

On January 25, 2005, the parties met at the property.  On February 18, 2005, Arch issued a $108,212.25 check for business property damage (Doc. No. 71-2 at 9).  It appears that an additional check for $2,561.39 was tendered on July 12, 2005, for business personal property (Doc. No. 70 at 4, Doc. No. 71-2 at 9).

On October 20, 2005, the undersigned held a hearing, originally scheduled to supervise the appraisal process, and inquired as to the status of the case (Doc. No. 54).  At that hearing, Plaintiff claimed that although the building claim was resolved by the appraisal, more monies were owed regarding a related, but as yet unarticulated, business interruption and expense claim.[5]  Arch asserted that it promptly adjusted the claims as they were documented, but that it had repeatedly requested additional documentation and Plaintiff had yet to present any other sufficient claim to adjust.[6]  Based on Plaintiff's representation that there was an unfinalized claim yet to be presented, the Court ordered Plaintiff to file an Amended Complaint, and to tender to Defendant "a complete and final proof of claim, with all necessary supporting documentation" no later than November 10, 2005 (Doc. No. 55).

Plaintiff provided documentation, as ordered, on the depreciation hold-back business personal property loss on November 10, 2005, and Arch paid it ($186,070.75) the next day (Doc. No. 68 at 2-3; Doc. No. 70-1 at 4).

---

[5]At hearing, the Court inquired of Plaintiff's counsel as to the amount of the loss: "Can you tell me standing here today what it is you think you are owed?"  Counsel responded: "The exact amount, no, I don't know.  I know it's more than --".  The Court replied: "Then how are they supposed to know?"  Doc. No. 88, Tr. 8: 11-15.  Plaintiff acknowledged that it received a business interruption payment on December 29, 2004, and another on September 8, 2005, and noted "We're trying to put together a file claim now."  *Id.*  at 7.

[6]The record includes correspondence from Arch's counsel throughout the process, explaining the need for clarification and documentation, under the Policy.  *See* Doc. No. 93-3.

**Initial Business Interruption Claim - No Sworn Proof of Loss tendered**

Although no formal sworn proof of loss was filed, Plaintiff contends that Arch "knew" that Plaintiff had sustained business income and extra expense losses, as the hotel was partially shut down from August 13, 2004 and fully shut down from September 5, 2004 through January 2005 (Doc. No. 71-2 at 2).

On September 17, 2004, following a telephone conversation between the parties' representatives, Plaintiff's adjuster forwarded three years of financial statements to Arch "in an effort to *begin* submitting documentation regarding the Business Income and Extra Expense claim for the hotel." (Doc. No. 71-2 at 3, emphasis added). Plaintiff's representative notes that he was "starting to send documentation" in support of the claims at that time (*Id*). Arch contends that Plaintiff never communicated a specific dollar amount of what it thought was owed on this claim (Doc. No. 59-2 at 5).

On November 17, 2004, Arch sent Plaintiff the above described letter which, in addition to those matters discussed above, also advised that Arch had retained a CPA to "review and evaluate the business income claim," including the documentation provided by Plaintiff. (Doc. No. 75-7). On November 19, 2004, the CPA wrote to Plaintiff's adjuster, referencing a previous telephone conversation, and requested specific additional documentation (monthly P & L's and franchise and management fee agreements) (Doc. No. 59-3).

On December 20, 2004, Arch Speciality Company issued a check in the amount of $217,181.15 for business income claim loss from August 13, 2004 to December 31, 2004. Arch issued another check on September 8, 2005, in the amount of $61,898.86, for business interruption (Doc. No. 71-2 at 9). Arch understood this to satisfy the business income claim, as there was no

indication from Plaintiff's adjuster that the payments were inadequate, or that additional amounts were owed (Doc. No. 59-2 at 5).

As stated above, the Court held a status conference on October 20, 2005, and Plaintiff asserted an additional but not yet articulated claim for business interruption loss. Arch avers that this was the first indication "that Plaintiff thought Arch's prior payments on the business income claim were insufficient . . .". (Doc. No. 68, footnote 1). As detailed above, the Court ordered Plaintiff to file an amended complaint, and to provide a complete and final proof of claim with all documentation no later than November 10, 2005. This became the final claim.

**Additional Business Income Claim and Extra Expense Claim [Second Amended Complaint]**

On October 31, 2005, Plaintiff filed its Second Amended Complaint (Doc. No. 56).

On November 8, 2005, Plaintiff filed a notice with the Court, stating its total business income and extra expense claim ($986,600 - Total Business income claimed was $295,400.00; extra expense was $691,200.00) (Doc. No. 57). Plaintiff provided supporting documentation for that claim at that time. As Arch had already paid $279,080.01 in business income losses, the newly asserted business income claim was for approximately $16,000.00 additional. The "extra expense" claim was described as a calculation of actual expenses during the impact period versus projected normal expenses, and appeared to include items that may have been covered by prior payments (Doc. No. 57-2 at 2-3).

On November 14, 2005, Arch moved to dismiss the Second Amended Complaint, asserting, yet again, that suit was premature in that the claim was just articulated and was in the process of being adjusted (Doc. No. 59). The motion was denied, without opinion, by endorsed Order of the District Court (Doc. No. 61).

On December 5, 2005, the parties attended a settlement conference before the undersigned (Doc. No. 63).  At that time, the parties consented to the jurisdiction of the United States Magistrate Judge (Doc. No. 89).  At conference, the newly asserted business interruption claim was compromised by the parties splitting the difference (Arch paying an additional $8,160.00) (Doc. No. 89 at p. 28). The remaining issue was the recently asserted extra expense claim in excess of $600,000.00.[7]  Arch contended that it did not have sufficient supporting explanation and documentation regarding the claim, but in any event, to the extent it included temporary repairs these were paid as part of the appraisal award; Plaintiff asserted that they should be viewed as part of a separate business interruption claim. The undersigned concluded the conference and advised the parties regarding readying themselves for trial.

On December 7, 2005, Arch answered the Second Amended Complaint, asserting *inter alia* that Plaintiff had not complied with the Policy and the suit was premature (Doc. No. 65).  The Court issued a Trial Order on the remaining extra expense claim.

On December 28, 2005, Plaintiff sent Defendant a letter which stated, in pertinent part:

> Tristar hereby notifies Arch Specialty that it considers its Extra Expense claim to be completely resolved, and seeks no further payment of insurance monies with regard to its Extra Expense claim (Doc. No. 68, at 10).

In noting that "all contractual damages due and owing Tristar have been resolved in favor of it," Plaintiff demanded attorney's fees pursuant to Fla. Stat. § 627.428.  *Id.*

Arch sought a status conference and asked for dismissal of the claim or a summary judgment declaring that there had been no breach of contract (Doc. No. 68).  The Court granted the motion for

---

[7]There were other minor issues involving the correct name of the payee and the newly raised signage damage claim, both since adjusted.

a hearing, and a case status conference was set for January 12, 2006 (Doc. No. 69).   On January 10, 2006, Plaintiff moved for attorney's fees and costs.  The motion acknowledged that Arch had paid significant amounts of money prior to any suit being filed and had paid additional amounts post suit.

At status conference, the Court cancelled the trial date, as the parties desired to proceed on the papers with respect to a finding as to the issue of whether Plaintiff is entitled to attorney's fees and costs, and a briefing schedule was set (Doc. No. 78).

On January 31, 2006, Plaintiff filed its motion for entry of judgment and to confirm the appraisal award.  Defendant has responded to that motion (Doc. No. 90) and to the motion for attorney's fees (Doc. No.93), and has moved for summary judgment.  Plaintiff has filed its opposition (Doc. No. 96), and both sides have filed additional notices and authorities (Doc. Nos. 95, 97, 98).  The matter is now ripe for resolution.

### ISSUES AND ANALYSIS

The parties agree that there are no coverage issues to adjudicate and the sole issue is whether Plaintiff is entitled to an award of attorney's fees and costs, given the sequence and circumstances of the claims being made, processed and paid.  Plaintiff contends that it is entitled to fees under Florida law, as Defendant's payment of the claims post-suit are "confessions of judgment." Defendant asserts that it cannot be liable for fees in that there has been no breach of contract, no judgment entered, and the suit was brought prematurely.  For the reasons set forth herein, the Court finds that, under the circumstances presented here, Plaintiff is not entitled to an award of fees, and the action is due to be dismissed.

### The Insurance Policy

We begin where we must: with the terms of the insurance contract.  The Policy provides:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**

\* \* \*

**E.  Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

\* \* \*

**2.  Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the value of the property and amount of loss.  If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.\* \* \*

**3.  Duties in the Event of Loss or Damage**

a.  You must see that the following are done in the event of loss or damage to Covered Property:

   \* \* \*

(2) Give us prompt notice of the loss or damage.  Include a description of the property involved.

   \* \* \*

(5) At our request, give us complete inventories of the damaged and undamaged property.  Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. \* \* \*

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim.  You must do this within 60 days after our request.  We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

   \* \* \*

**4.  Loss Payment**

a.  In the event of loss or damage covered by this coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

-11-

(2) Pay the cost of repairing or replacing the lost or damaged property, . . .[8]
(3) Take all or any part of the property at an agreed or appraised value; or
(4) Repair, rebuild or replace the property with other property of like kind and quality, ...
     * * *
c.  We will give notice of our intentions within 30 days after we receive the sworn proof of loss.
       * * *
g.  We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and
(1) We have reached agreement with you on the amount of loss; or
(2) An appraisal award has been made.

(Doc. No. 56-2).

### BUSINESS INCOME AND EXTRA EXPENSE COVERAGE
* * *
### C. Loss Conditions
* * *
(4) Take all reasonable steps necessary to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim.
(5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. . . .
(6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim.  You must do this within 60 days after our request.  We will supply you with the necessary forms.
(7) Cooperate with us in the investigation and settlement of the claim.
(8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

(Doc. No. 56-3).

The Policy also notes:

### D. Legal Action Against Us

No one may bring a legal action against us under this Coverage Part unless:
1. There has been full compliance with all of the terms of this Coverage Part . . .

(Doc. No. 56-3).

---

[8]Another provision notes that the Insurance Company will not pay on a replacement costs basis for any loss or damage "until the lost or damaged property is actually repaired or replaced."  (Doc. No. 56-2 at 30).

The relationship between insurer and insured is also governed by statute and Florida case law.

***Florida Law*** [9]

Fla. Stat. § 627.428 provides, in pertinent part:

> Attorney's fee
>
> (1) Upon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer, the trial court or, in the event of an appeal in which the insured or beneficiary prevails, the appellate court shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had.

Plaintiff correctly sets forth the legislative intent of the provision:

> The Supreme Court of Florida has ruled that the purpose of Florida Statute §627.428 (and its predecessor) is to discourage the contesting of valid claims by insurance companies and to reimburse successful insureds for their attorney fees when they are compelled to defend or sue to enforce their insurance contracts. *Insurance Company of North America v. Lexow*, 602 So.2d 528 (Fla. 1992). The Statute penalizes insurers for wrongfully causing its insureds to resort to litigation to resolve a conflict. *Leaf v. State Farm Mutual Automobile Insurance Co.*, 544 So.2d 1049 (Fla. 4th DCA 1989); *Government Employees Insurance Company v. Battaglia*, 503 So.2d 358 (Fla. 5th DCA 1987).

(Doc. No. 70 at 9).

Moreover, Plaintiff correctly notes that Florida courts have held that, in certain circumstances, payment of the claim is the functional equivalent of a confession of judgment or verdict in favor of the insured; reasoning that the insurance company should not be able to avoid the statutory provision by merely waiting until suit is filed before paying proceeds. *Mercury Insurance Co. v. Cooper,* 919 So. 2d 491 (Fla. 3rd DCA 2005). Further, "a trial court has no discretion to deny reasonable

---

[9]This is a diversity action, and it is undisputed that Florida law controls.

attorney's fee to the prevailing plaintiff where the insurance company first disputes the claim and then settles the case after a lawsuit is filed." *Amador v. Latin American Property and Casualty Insurance Company,* 552 So.2d 1132, 1133 (Fla. 3d DCA1989); *Losicco v. Aetna Casualty & Surety Company*, 588 So.2d 681 (Fla. 3d DCA1991).  Thus, the law is clear that if Plaintiff was compelled to sue because the insurance company wrongfully caused it to resort to litigation, fees must be awarded if the policy is paid after suit.  Such is not the case here.

As the above chronology indicates, at the time this Defendant was sued, it had already paid well over a million dollars on the building claim, hundreds of thousands of dollars on other claims, and was in the process of adjusting the remaining claims.  Although Plaintiff contends that Arch "failed to timely pay all insurance proceeds due and owing," there is no evidence in this record to support such a conclusion.  Indeed, Plaintiff does not identify when the various claims were due and payable. In order to determine whether the insurance company breached its contract, we must examine each claim made, in light of the parties' respective duties under the Policy and Florida law.

**The building damage claims**

As noted above, Plaintiff tendered the first sworn proof of loss and it was paid  within 30 days. As a matter of law, there can be no liability for breach with respect to this claim, as the insurer timely paid in full.

As for the second building damage claim, Plaintiff filed its proof of loss on October 20.  As required by the Policy, Arch responded within 30 days with its intentions: to review the multi-million dollar claim and supporting documentation and to meet with the insured on site to go over the loss. Considering the scope of the claim, and the fact that the insurer had already paid over a million dollars based on the first proof of loss relating to the same alleged loss, the insurer cannot be said to have

acted unreasonably in asserting its rights to inspection and further investigation of the claim, as set forth in the Policy.  According to the Policy, Plaintiff had a duty to cooperate with Arch and allow such an inspection, in the process of adjusting the claim.

Plaintiff filed suit on December 6.  At the time suit was filed, Plaintiff can point to nothing to indicate that the policy terms were breached with respect to this claim.  Following filing of the suit, the supplemental building claim went to appraisal, as provided for in the Policy, and the claim was timely paid in full following issuance of the appraisal.  As noted by the District Judge, Plaintiff did not contest that the appraisal was a precondition to the suit under the Policy (Doc. No. 27 at 2).  Thus, Plaintiff has failed to articulate any breach of the Policy sufficient to justify filing suit on the building claim, and the payment of the claim, following the appraisal award, was timely and in accordance with the Policy.

**The Business Property Claim**

Here, as well, Plaintiff fails to articulate a basis for finding breach.  The record shows that a substantial contents claim was made on October 20.  The insurer responded on November 17, within the 30 days provided by the Policy, and set forth its intention to review the voluminous claim, and meet with Plaintiff at the site.  The insurer also noted that a salvor was involved with respect to inspecting the contents and determining value and disposition of the property, and this was acceptable.  Although it is evident that Arch was being responsive in reviewing and adjusting the claim, consistent with the Policy, Plaintiff sued less than three weeks later.  Again, Plaintiff identifies no duty breached by the insurer.  The insurer did not reject the claim, as its letter plainly notes, but required additional

-15-

Case 6:05-cv-00098-DAB Document 99 Filed 06/01/06 Page 16 of 24 PageID 2025

time and information in order to process it.[10]  Under the circumstances presented here, and in view of the fact that Arch had already been in frequent communication with Plaintiff regarding the losses and had already paid over a million dollars on the related claim, the insurer was within its rights to adjust the claim.  The claim was not rejected; Plaintiff was not ignored.  At the time suit was filed, no breach had occurred.

Moreover, Plaintiff identifies no post-suit breach with respect to this claim.  By December 28, 2004, an advance of $300,000 was paid and, less than a month after the parties met at the site, an additional $108,212.25 was paid.  Arch has contended throughout this suit that it was exceptionally difficult to obtain requested information and supporting documentation from Plaintiff with respect to these claims, and, as information was provided, the claims were paid. As noted above, in his papers and at hearing, Plaintiff's counsel has had difficulty articulating its claims to the Court, preferring to rely on a general assertion that "monies are owed" without supporting explanation.  As cooperation with the insurer in providing documentation is a condition precedent to payment of the claims, as well as to bringing suit, Plaintiff has not carried its burden of establishing that the delay in payment of this claim was due to the insurer's breach.

As for the additional depreciation hold back claim, the record shows that this claim was not properly asserted until November 10, 2005, and the insurer paid it on November 11, 2005.  No breach is established.

**Business Interruption/Income**

---

[10]As quoted above, the Policy provides that the insurer has the option of paying the value of the lost property, or the cost to repair or replace it.  The Policy implies a reasonable time for the insurer to investigate these options.

The Court notes that Plaintiff did not comply with the provision requiring a sworn proof of loss with respect to this loss, but the insurer accepted the claim and processed it anyway.[11]  Following receipt of the October 20 proof of loss directed to the other claims, Arch sent Plaintiff the above described letter which, in addition to those matters discussed above, advised that Arch had retained a CPA to "review and evaluate the business income claim," including the documentation provided by Plaintiff.  On November 19, just two days later, the CPA wrote to Plaintiff's adjuster and requested specific relevant additional documentation.  Suit was filed December 6.  Plainly, at the time suit was filed, this claim was in the process of being adjusted and the insurer was awaiting additional requested documentation.  Indeed, on December 20, 2004, less than a month after requesting the information, Arch issued a check in the amount of $217,181.15 for business income claim loss from August 13, 2004 to December 31, 2004.  Again, Plaintiff has not established breach in that it has not established the amount of the claimed loss or that the insurer had a duty to pay prior to December 6.  As noted above, Plaintiff did not articulate the specific amount of the loss it was claiming, but, rather, sent the insurer various documents for the insurer to evaluate, regarding an appropriate amount.  Arch requested additional information, hired an expert, evaluated the "claim" and paid it.

Moreover, Arch continued to accept, evaluate and pay for business income losses as they were presented and documented.  Arch issued another check on September 8, 2005, in the amount of $61,898.86, for business interruption, and, as detailed above, an additional claim was made in early November and compromised in December.  There is no evidence that the insurer denied any claim; rather, the evidence indicates that it was Plaintiff that struggled to define its claims.  Plaintiff had a

---

[11]This is hardly the hallmark of a recalcitrant insurer.

great deal of difficulty even *articulating* the basis for its Second Amended Complaint; admitting at

hearing that it *did not know* the amount of the claim and was *in the process* of putting it together.

Indeed, the extra expense claim–over $600,000–was abandoned by Plaintiff, presumably because it

was, as suggested by the insurer, part of the building damage claim which was already paid for in full.

There has been no showing that the insurer failed to timely pay claims properly made and

substantiated, sufficient to warrant the suit.

Plaintiff appears to cite the above authorities for the proposition that the Court has no

discretion not to award fees whenever a Plaintiff sues an insurer and money is later paid. The Court

declines to read the statute so broadly, for several reasons. If Plaintiff were correct, then it would

behoove every policyholder to sue whenever a claim is contemplated, because, regardless of whether

the claim is eventually adjusted downward or paid in full, attorney's fees would automatically result.

*See Basik Exports & Imports, Inc. v. Preferred Nat. Ins. Co.,* 911 So. 2d 291 (Fla. 4th DCA 2005)

(noting, in a similar context, that insurers would be discouraged from settling third-party claims they

defend under a reservation of rights for settlement will subject them to paying attorney's fees for an

unnecessary declaratory judgment action filed by the insured). This, however, would be contrary to

the stated purpose of the statute: discouraging lawsuits and encouraging timely payments of claims.

If the insurer knows it will eventually have to pay attorney's fees regardless, it loses the incentive to

pay the claim timely, and this would raise the likelihood that the claim will be contested.[12] Moreover,

there is a fundamental due process concern in finding that an insurance company which appropriately

---

[12]Florida has recognized a public policy to encourage insurance companies to resolve conflicts and claims quickly and efficiently through alternative dispute resolution avenues such as appraisal. *Nationwide Property & Casualty Ins. v. Bobinski,* 776 So. 2d 1047, 1049 (Fla. 5th DCA 2001) (noting that appraisal and arbitration will hopefully "serve to suppress the ever increasing cost of insurance protection.") Id. This public policy is compromised if an insurer is sued prior to completion of the appraisal process. *But see Travelers v. Meadows MRI, LLP.* 900 So. 2d 676 (Fla. 4th DCA 2005).

pays a valid claim according to the Policy terms must still pay attorney's fees, because a claimant sued it to do what it was already in the process of doing. As stated above, this statute, and its predecessors, have consistently been interpreted to authorize recovery of attorney's fees from an insurer only when the insurer has wrongfully withheld payment of the proceeds of the policy. *See New York Life Insurance Company v. Shuster,* 373 So.2d 916 (Fla. 1979); *Manufacturers Life Insurance Company v. Cave*, 295 So.2d 103 (Fla. 1974); *The Equitable Life Assurance Society v. Nichols*, 84 So.2d 500 (Fla. 1956).

For similar reasons, the Court rejects Plaintiff's argument that payments made pursuant to the provisions of the Policy are somehow converted into a confession of judgment if done after suit is prematurely filed.  The filing of a lawsuit does not extinguish the insurer's obligations under the Policy to adjust and pay the claim.  While Florida law does hold that payments are treated as confessions of judgment where an insurer first disputes the claim and then settles, the existence of a bona fide dispute and not the mere *possibility* of a dispute, is a crucial condition precedent to such a holding.  *See Wollard v. Lloyd's and Companies,* 439 So. 2d 217, 218 fn. 2 (Fla. 1983) (recognizing as a "threshold issue" "the requirement that the insurance company unreasonably withhold payment under the policy as a condition precedent to the award of attorney's fees.")  Here, as noted above, there has been no such breach shown.

Absent a judgment of breach, a "confession of judgment," or a settlement on a disputed claim, Plaintiff seeks a judgment on the appraisal. This, too, is misguided. The Second Amended Complaint did not seek a judgment on the appraisal, and in fact, the appraisal award was timely paid as of the

date of filing the Second Amended Complaint.[13]  Thus, the motion to confirm the award was moot when filed months later.  Plaintiff is not entitled to a judgment under these circumstances.  *Nationwide Property & Casualty Insurance v. Bobinski,* 776 So. 2d 1047 (Fla. 5th DCA 2001) (no attorney's fees awarded when appraisal is paid prior to suit, and appraisal award is not a final judgment under Section 627.428).

While Plaintiff cites a plethora of cases in favor of attorney's fees, the Court finds that none of these reflect the situation at bar; namely, a Plaintiff who has failed to show that the insurer breached any duty to investigate, adjust and timely pay under the Policy.

*Mercury v. Cooper, supra,* involved an insurer who settled with a third party and then dismissed a declaratory judgment action it had filed.  The Third District Court of Appeal found that the unilateral decision of the insurance company to settle with the injured third party and dismiss the declaratory judgment action triggered a right to fees for the insured.  919 So. 2d at 491.  Here, of course, the insurance company did no such thing.  There was no settlement of a contested claim, and no dismissal of a suit filed by Arch.

*United Automobile Insurance Company v. Zulma,* 661 So. 2d 947 (Fla. 4th DCA 1995) held that when the insurer agrees to settle a disputed case it has, in effect, declined to defend its position in the pending suit, and thus payment is the functional equivalent of a confession of judgment.  Here, however, Arch never declined to defend its position.  Indeed, its position, asserted consistently, has been that the lawsuit is premature in that the claims were being adjusted and appraised in accordance with the Policy.  Thus, it did not settle a dispute; it adjusted, and paid, the claim.  *Zulma* is inapposite.

---

[13]The record reflects that the check was issued October 27, 2005, and hand delivered October 31, 2005 – the date the Second Amended Complaint was filed.  Moreover, as recognized by the District Court in its Order dismissing the Amended Complaint, the appraisal process was a condition precedent to filing suit.

*Insurance Company of North America v. Lexow,* 602 So. 2d 528 (Fla. 1992) involved a subrogation claim recovery, following payment of policy limits.  Finding "there is little difference between paying an insurance claim and then suing for its return and refusing to pay the claim in the first place," the Florida Supreme Court held that the statute applied.  These facts, however, are not present or analogous here.

*Ivey v. Allstate Ins. Co,* 774 So. 2d 679 (Fla. 2000) involved a claim for personal injury protection benefits.  The court held, *inter alia,* that "[i]f a dispute arises between an insurer and an insured, and judgment is entered in favor of the insured, he or she is entitled to attorney's fees.  It is the incorrect denial of benefits, not the presence of some sinister concept of "wrongfulness," that generates the basic entitlement to the fees if such denial is incorrect."  This Court does not disagree. Again, however, Plaintiff has not shown that there was an incorrect denial of benefits in this case, or in fact, any denial of benefits.

Plaintiff's reliance on *Travelers v. Meadows MRI, LLP,* 900 So. 2d 676 (Fla. 4th DCA 2005), is similarly misplaced.  In that case, the insurance company took four months to determine whether or not there was coverage, and then commenced "a lengthy investigation" of the amount of the loss. Moreover, plaintiff filed suit long before the appraisal was completed, and obtained a final judgment confirming the appraisal award.  As noted by the state court, Meadows' involvement of the formal judicial system was not unnecessary in that it had to retain counsel to compel the insurance company to accept coverage and to determine the proper procedure for the appraisal, and it was noted that Meadows' attempted to resolve any differences without resorting to formal legal action. Here, however, Arch never disputed coverage (let alone took four months to acknowledge it), paid the first

proof of loss in full pre-suit, and continued to pay, including payment of the appraisal, without a court order or judgment to do so.  The claimants in the two cases are not comparable.

*Stewart v. Midland Life Insurance Co.,* 899 So. 2d 331 (Fla. 2nd DCA 2005) is a life insurance case, interpreting the provision of Florida law disallowing an attorney's fee if suit was commenced prior to 60 days after proof of claim was filed with the insurer.  Fla. Stat. § 627.428(2).  As suit was filed there 86 days after proof of claim, and the insurer then paid in full, attorney's fees were allowed.  No such statutory provision applies to the instant case.  The terms of the Policy control.

The Court finds that this case is more analogous to the line of cases denying attorney's fees awards, in the absence of any breach of contract by the insurer.  *See Garcia v. Lumbermens Mutual Insurance Company,* 246 So. 2d 574 (Fla. 3rd DCA 1971) (where there is no denial of coverage and no necessity to institute suit to confirm or collect on an arbitration award, attorney's fees were not awardable); *Geico v. Battaglia,* 503 So. 2d 358 (Fla. 5th DCA 1987) (a fee was not properly awarded when there was no evidence that the insurer wrongfully denied coverage); *Fortune Insurance Co. v. Iriban,* 593 So. 2d 598 (Fla. 3rd DCA 1992) (reversing attorney's fees judgment because insurance benefits were not wrongfully withheld).

In *Obando v. Fortune Insurance Co.*, 563 So.2d 116, 117 (Fla. 3d DCA 1990), the appellate court affirmed an order denying attorney's fees.  As stated by that court:

> At the time the complaint was filed, there were no unpaid medical bills pending and the carrier had asked for follow-up information and any additional medical bills. When subsequent medical bills accrued and the aggregate exceeded the insured's $2,000 deductible, the carrier settled all claims submitted within thirty days.  Consequently, until such time as benefits were wrongfully withheld, the insured's attorney was in no better position than the insured himself to claim a denial of coverage and the right to any applicable attorney's fees.

*Id.* Here, too, absent a showing that the benefits were wrongfully withheld, counsel is in no position to claim a denial of coverage, and thus, no attorney's fee is properly awardable.

A final note is in order. The Court stresses that this decision does no more than enforce the long-standing policy of the state of Florida that attorney's fees are not available under the statute unless there is a showing that the insurance company incorrectly denied benefits. The decision is not to be interpreted as encouraging insurance companies to engage in lengthy adjustment processes and the Court cautions that an unreasonably long adjustment process can well result in a delay of payment sufficient to constitute a breach. The Court finds, however, that such did not occur in this case. Suit was filed (albeit against the wrong defendant) only a month and a half after filing the second proofs of loss, and after the first proof of loss (over a million dollars) was already paid in full. While Plaintiff wanted immediate payment, it did not contract for that, nor is such reasonable or even possible, considering the scope of the disaster and the size of the loss, particularly where the claimant itself was uncertain of the size of its claims. Here, the insurer acted in accordance with the Policy at all relevant times. As such, no attorney's fees are due under Florida law, and no entitlement to pre-judgment interest has been shown.

The Second Amended Complaint is thus dismissed, with prejudice, with each party to bear its own costs. The Clerk is directed to enter a final judgment in favor of Defendant, terminate all pending matters, and close the file.

**DONE** and **ORDERED** in Orlando, Florida on June 1, 2006.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

-23-

Copies furnished to:

Counsel of Record